

1   PETER D. LEPISCOPO, ESQ.  C.S.B.  #139583
    JAMES M. GRIFFITHS, ESQ.  C.S.B.  #228467
2   LAW OFFICES OF PETER D. LEPISCOPO
    2635 Camino del Rio South, Suite 109
3   San Diego, California 92108
    Telephone:  (619) 299-5343
4    Facsimile:  (619) 299-4767

FILED

2006 SEP 14  AM 11: 48

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

5   Attorneys for Intervenor and Defendant, **PACIFIC JUSTICE INSTITUTE**

6

7

8                     UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11  STEVE TRUNK and PHILIP K.          )   Case No.  **06-CV-1597 BTM (WMc)**
    PAULSON,                           )
12                                     )
         **Plaintiffs,**               )   **PACIFIC JUSTICE INSTITUTE'S <u>REPLY</u>**
13                                     )   **TO OPPOSITIONS TO PACIFIC**
         **v.**                        )   **JUSTICE'S MOTION TO INTEREVENE**
14                                     )
    CITY OF SAN DIEGO, THE UNITED      )   **[F.R.Civ.P. 24]**
15  STATES OF AMERICA, DONALD H.       )
    RUMSFELD, et al.,                  )
16                                     )
                                       )
17       **Defendants,**               )   DATE:  **September 21, 2006**
                                       )   TIME:  **8:30 a.m.**
18       **AND**                       )   COURTROOM:  **15**
                                       )   JUDGE: **HON. BARRY TED MOSKOWITZ**
19  PACIFIC JUSTICE INSTITUTE,         )   TRIAL DATE:  none set
                                       )
20       **Intervenor-Defendant.**     )

21

22                     <u>PRELIMINARY STATEMENT</u>

23       On September 8, 2006, plaintiffs filed their 1st Amended Complaint. Pacific Justice waited

24  until the filing of that document before preparing the actual Motion to Dismiss, which is the

25  pleading/motion that Pacific Justice would file if intervention is permitted. In this regard, a copy

26  of Pacific Justice's full completed and signed Memorandum of Points and Authorities in Support

27

28  _____
          Pacific Justice Institute's <u>Reply</u> To All Oppositions To Pacific Justice's Motion To Intervene



                                      -1-

of Motion to Dismiss is attached hereto as Exhibit "A." The **originals** of the (1) Notice of Motion and Motion and (2) Memorandum of Points and Authorities in Support of Motion to Dismiss have been provided to the Clerk. In the event that the Court permits intervention and orders the filing of Pacific Justice's motion to dismiss—the Court need only set the hearing date. Finally, copies of the Notice of Motion and Motion and the Memorandum of Points and Authorities in Support of Motion to Dismiss have been served on all parties, along with this Reply brief.

## COMBINED REPLY TO ALL OPPOSITION

For ease of reading, this Reply contains Pacific Justice's responses to <u>all</u> of legal points raised in the oppositions filed by the plaintiffs, the City of San Diego, and the United States of America and Secretary Rumsfeld. They all argue that Pacific Justice does not have a protectable interest in this litigation and that the City of San Diego and the United States will adequately protect Pacific Justice's interests, and the plaintiffs argue that Pacific Justice's motion to intervene is untimely. As will be demonstrated below, none of the assertions has merit, and, therefore, the Court should grant Pacific Justice's motion to intervene.

## REPLY ARGUMENT

## I.

## THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA HAS ALREADY FOUND THAT PACIFIC JUSTICE HAS PROTECTABLE INTERESTS IN LITIGATION SIMILAR TO THE CASE AT BAR

In the case of *Newdow v. The Congress of the United States of America*, ___ F.Supp.2d ___, 2006 WL 1652231, E.D.Cal., (E.D. June 12, 2006)("Newdow"), U.S. District Judge Frank Damrell **granted** Pacific Justice's motion to intervene both as a matter of right and permissively in

a case involving the National Motto. A copy of Judge Damrell's January 6, 2006, **9-page** order

**granting** intervention is attached hereto as Exhibit "B." The *Newdow* case concerned the

constitutionality of the phrase "*In God We Trust*" as the National Motto. Citing the Ninth Circuit's

decision in *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir.1995)("*Idaho*

*Farm Bureau Fed'n*"), Judge Damrell found that Pacific Justice clearly has protectable interests:

> "*Applicant's mission is the preservation of religious liberty, including public*
> *expressions of the nation's religious history and heritage. Applicant has*
> *represented individuals, houses of worship, and religious organizations which have*
> *been treated unjustly due to their religious preferences. Applicant also assists*
> *governmental entities which are attacked for public acknowledgments of America's*
> *religious heritage. Applicant asserts that the interpretation of the Establishment*
> *Clause and the constitutionality of the motto 'In God We Trust' in the present*
> *action will affect PJI's mission and activities. **Given the Ninth Circuit's holding***
> ***that Rule 24 should be construed broadly in favor of the applicant, applicant has***
> ***an interest in the subject matter of the litigation.** See Idaho Farm Bureau Fed'n,*
> *58 F.3d at 1397.*"

(Exh. B: Judge Damrell's 1/6/06 Order, p. 6; citations to declarations omitted.)

Just as Judge Damrell found in *Newdow*, PJI's mission is dedicated to the preservation of

religious and civil liberties, including public expressions of the nation's religious history and

heritage. In this regard, PJI has represented numerous faith-based organizations, individuals,

houses of worship, and religious organizations, which have been treated unjustly due to their

religious preferences. PJI also assists governmental entities that are attacked for public

acknowledgements of America's religious heritage. (Decl. of Snider, ¶¶4 & 5.)

PJI asserts that the interpretation of the Establishment Clause and the constitutionality of

the Mt. Soledad War Memorial in the present action "would have a significantly deleterious effect

on" PJI's work and on PJI's mission to protect religious liberty, including public expression of

religious heritage. In addition, PJI contends that if successful, "the present lawsuit would greatly

restrict" PJI's ability to defend governmental actors who regularly seek PJI's "advice and

1  representation when they attempt to objectively acknowledge our nation's religious heritage."

2  (Decl. of Snider, ¶¶11 & 12.)

3       Contrary to the oppositions of the plaintiffs, the City of San Diego, and the United Stats

4  and Secretary Rumsfeld, and as already held by Judge Damrell in *Newdow*, Pacific Justice has

5  significant interests in this litigation to justify intervention. *Idaho Farm Bureau Fed'n, supra*, 58

6

7  F.3d at 3197.

8

9  ## II.

10  ## PACIFIC JUSTICE'S INTERESTS WILL NOT BE ADEDQUATELY

11  ## REPRESENTED BY THE CITY OF SAN DIEGO OR THE UNITED STATES

12

13       The plaintiffs, the City of San Diego, and the United States and Secretary Rumsfeld argue

14  that the City of San Diego and the United States will adequately protect Pacific Justice's interests.

15  In addition to the reasons given in Pacific Justice's opening memorandum, neither the City of San

16  Diego nor the United States has protected Pacific Justice's interests in the past and there is no

17  guarantee that they will protect them in the future.

18  **A.**    **IN THE SUPERIOR COURT LITIGATION THE UNITED STATES DID NOT**

19      **INTERVE TO PROTECT A CONGRESSIONAL STATUTE (§116, 118 Stat. 3346)**

20      **OR TO PROTECT THE MT. SOLEDAD WAR MEMORIAL EVEN THOUGH A**

21      **CONGRESSIONAL STATUTE MADE THE UNITED STATES AN**

22      **INDISPENSABLE PARTY**

23       In his July 7, 2006, order granting the stay of Judge Thompson's order to remove the cross

24  from the Mt. Soledad War Memorial, Supreme Court Justice Kennedy noticed that the 2004 Act of

25  Congress (§116, 118 Stat.3346), that designated Mt. Soledad War Memorial as a national war

26  memorial, had not yet been considered in the underlying state and federal litigations:

27

28

---

Pacific Justice Institute's <u>Reply</u> To All Oppositions To Pacific Justice's Motion To Intervene

*"In addition, two further factors make this case 'sufficiently unusual' to warrant granting a stay. First, a recent Act of Congress has deemed the monument a 'national memorial honoring veterans of the United States Armed Forces' and has authorized the Secretary of the Interior to take title to the memorial on behalf of the United States...§116, 118 Stat.3346. Because this legislation postdates the Court of Appeals' previous decisions in this case, **its effect in the litigation has yet to be considered**."*

*San Diegans for the Mt. Soledad National War Memorial v. Paulson*, 548 U.S. ____ (July 7, 2006)(Slip Op. pp. 2-3)(emphasis added).

The significance of this is that in the San Diego Superior Court proceedings[1] challenging the constitutionality of Proposition A, the Justice Department never intervened to protect the Congressional statute (§116, 118 Stat.3346) or the interests of the United States. The transfer of the property under §116, 118 Stat.3346 from the City of San Diego to the United States was the very subject matter of the Proposition. Accordingly, the United States clearly had a protectable interest that would be and in fact was affected by the Superior Court's decision. This, of course, made the United States an indispensable party to the Superior Court case.

For whatever reason, the Justice Department decided to not enter the Superior Court litigation to protect the United States' interests under §116, 118 Stat. 3346. Of course this decision is discretionary on the part of the Justice Department, and Pacific Justice does not mean to imply that there was something unethical or nefarious about the decision. However, it is this type of decision that requires Pacific Justice to be permitted to intervene as a matter of right in this case. There is no telling whether the Department of Justice will pursue an appeal to the Ninth Circuit and/or the U.S. Supreme Court in the event that plaintiffs were to prevail in whole or in part.

/////

---

[1] *Paulson v. Abdelnour*, No. GIC-849667 (Oct. 7, 2005).

Pacific Justice Institute's <u>Reply</u> To All Oppositions To Pacific Justice's Motion To Intervene

1    Pacific Justice wants to pursue this litigation to its final court of last resort in order to
2    protect its interests. *See, e.g. Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1104 (9th Cir.
3    2002) (intervenors, environmental groups, appealed decision invalidating U.S. Forest Service's
4    "Roadless Rule" restricting potential environmental impact after federal government chose <u>not</u> to
5    appeal); *State of California Dept. of Social Svcs. v. Thompson*, 321 F.3d 835 (9th Cir. 2003)
6    
7    (allowing intervenor to appeal decision even though state chose <u>not</u> to do so).
8        Interestingly, in the *Newdow* case the United States did not oppose Pacific Justice's motion
9    to intervene, whereas in this case it opposes intervention by same party. This is yet another
10   example of the inconsistencies with large bureaucracies and another example of why Pacific
11   Justice should be permitted to intervene. *See, e.g., Thompson, supra*, 321 F.3d 835.
12   
13   
14   **B.    IN THE SUPERIOR COURT PROCEEDINGS THE CITY OF SAN DIEGO NEVER**
15        **MADE A MOTION TO DISMISS BECAUSE OF THE PLAINTIFF'S FAILURE TO**
     **JOIN AN INDISPENSABLE PARTY—THE UNITED STATES**
16        In any civil defense, a rudimentary response to a civil action would include objections to
17   the absence of indispensable parties. In this regard, the City of San Diego failed to make such a
18   
19   motion in the superior court proceedings relative to the absence of the United States. Clearly, the
20   presence of the United States in the superior court proceedings would have assisted the City of
21   San Diego in its defense. Much like the Department of Justice, the City Attorney's Office decided
22   to not make such a basic motion, which is precisely why Pacific Justice moves to intervene in
23   order to protect its significant interests in this case.
24   /////
25   /////
26   /////
27   
28   
─────────────────────────────────────────────
     Pacific Justice Institute's <u>Reply</u> To All Oppositions To Pacific Justice's Motion To Intervene

## III.

## PACIFIC JUSTICE MOTION IS TIMELY

Plaintiffs' admit in their opposition that Pacific Justice's motion was filed within days after plaintiffs filed this action. (Plaintiffs' Opp., p. 5, ll. 22-23.) Plaintiffs, however, contend that since the litigation of the Mt. Soledad War Memorial has been ongoing for 17 years that somehow disqualifies Pacific Justice's motion to intervene in this case. As is explained in greater detail in Pacific Justice's Motion to Dismiss (Exh. A hereto), the litigation regarding the constitutionality of the recent Act of Congress (P.L. 109-272, 120 Stat. 770) passed to preserve the Mt. Soledad War Memorial has just commenced. Consequently, the previous litigations under the California Constitution have no relevance because this case will be analyzed under the Establishment Clause of the First Amendment to the U.S. Constitution. Legally speaking, this is a new litigation. Accordingly, it cannot be seriously disputed that Pacific Justice's motion is untimely. *See, e.g., Sierra Club v. U.S. E.P.A.*, 995 F.2d 1478, 1481 (9th Cir. 1993) (timeliness not at issue when motion to intervene was filed at outset of litigation, before answer to complaint was even filed).

## CONCLUSION

For the foregoing reasons and the reasons set forth in Pacific Justice's opening memorandum, applicant and proposed intervenor-defendant Pacific Justice Institute is entitled to participate in this action as Intervenor-Defendant, either as a matter of right. *See* F.R.Civ.P. 24(a), or with the Court's permission, F.R.Civ.P. 24(b).

////

/////

Pacific Justice Institute's <u>Reply</u> To All Oppositions To Pacific Justice's Motion To Intervene

-7-

1   DATED:  **September 14**, 2006.                    **LAW OFFICES OF PETER D. LEPISCOPO**

2

3                                                       By

4                                                          Peter D. Lepiscopo, Esq.,

5                                                          Attorneys for Proposed Intervenor and
                                                           Defendant, **PACIFIC JUSTICE
6                                                          INSTITUTE**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **CASE NAME: _TRUNK v. CITY OF SAN DIEGO, et al._     CASE NO.: 06-CV-1597-BTM**

2

3                          **CERTIFICATE OF SERVICE BY U.S. MAIL**

4

5   STATE OF CALIFORNIA, COUNTY OF SAN DIEGO:

6           I am over the age of eighteen years, and not party to this action.  My business address is
    **2635 Camino del Rio South, Suite 109, San Diego, California 92108**, which is located in the
7   County where the mailing described below took place.

8           I am readily familiar with the business practice at my place of business for collection and
    processing of correspondence for mailing with the United States Postal Service.  Correspondence
9   so collected and processed is deposited with the United States Postal Service that same day in the
10  ordinary course of business.

11  On **September 14**, **2006**, at my place of business at San Diego, California, the following:

12          **PACIFIC JUSTICE INSTITUTE'S REPLY TO OPPOSITIONS TO PACIFIC
            JUSTICE'S MOTION TO INTEREVENE**
13

14  was placed for deposit in the United States Postal service in a sealed envelope, with postage fully
    prepaid, addressed to:

15

16          **JAMES E. McELROY, ESQ.**              **Attorneys for Plaintiffs**
            625 Broadway, Suite 1400
            San Diego, California 92101
17
            **KEVIN S. WEBB, Assistant  Attorney General**    **Attorneys for United States of America**
18          Department of Justice                              **and Secretary Donald H. Rumsfeld**
            601 "D" Street, N.W., Room 8130
19          Washington, DC 20004

20          **DAVID J. KARLIN, Deputy City Attorney**    **Attorneys for City of San Diego**
            1200 Third Avenue, Suite 1100
21          San Diego, California 92101

22  and that envelope was placed for collection and mailing on that date following ordinary business
    practices.
23

24          I certify and declare under penalty of perjury under the laws of the State of California that
    the foregoing is true and correct.

25          Executed on this **14th** day of **September**, **2006**.

26                                                  

27                                                          Peter D. Lepiscopo, Esq.

28  _____

         Pacific Justice Institute's Reply To All Oppositions To Pacific Justice's Motion To Intervene

# Exhibit  A

1  PETER D. LEPISCOPO, ESQ.  C.S.B.  #139583
   JAMES M. GRIFFITHS, ESQ.  C.S.B.  #228467
2  LAW OFFICES OF PETER D. LEPISCOPO
   2635 Camino del Rio South, Suite 109
3  San Diego, California 92108
   Telephone:  (619) 299-5343
4   Facsimile:  (619) 299-4767

5  Attorneys for Intervenor and Defendant, **PACIFIC JUSTICE INSTITUTE**

6

7

8                       **UNITED STATES DISTRICT COURT**

9                      **SOUTHERN DISTRICT OF CALIFORNIA**

10

11

12  STEVE TRUNK and PHILIP K.          )  Case No.  **06-CV-1597 BTM (WMc)**
    PAULSON,                           )
13                                     )
            Plaintiffs,                )  **PACIFIC JUSTICE INSTITUTE'S**
14                                     )  **MEMORANDUM OF POINTS AND**
                                       )  **AUTHORITIES IN SUPPORT OF**
15          v.                         )  **MOTION TO DISMISS  1ST AMENDED**
                                       )  **COMPLAINT**
16  CITY OF SAN DIEGO, THE UNITED      )
    STATES OF AMERICA, DONALD H.       )     **[F.R.Civ.P. 12(b)(1)&(6)]**
17  RUMSFELD, et al.,                  )
                                       )
18          Defendants,                )
                                       )
19          AND                        )  DATE: **To be set by Court: _____, 2006**
                                       )        TIME:  **2:00 p.m.**
20  PACIFIC JUSTICE INSTITUTE,         )  COURTROOM:  **15**
                                       )  JUDGE: **HON. BARRY TED MOSKOWITZ**
21                                     )  TRIAL DATE:  none set
            Intervenor-Defendant.      )
22  _____  )

23

24  /////

25  /////

26  /////

27  /////

28

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES ........................................................................ iii

I.   INTRODUCTION......................... ......................................................... 1

II.  RELIEF REQUESTED AND STATUTORY AUTHORITY.............................. 1

III. PLAINTIFF'S ALLEGATIONS IN THE FIRST AMENDED
     COMPLAINT RE: STANDING ................................................................. 2

IV.  RELEVANT FACTUAL BACKGROUND AND SUMMARY
     OF THE MOUNT SOLEDAD WAR MEMORIAL AND OTHER
     NATIONAL WAR MEMORIALS, MONUMENTS, MILITARY
     PARKS, AND CEMETARIES................................................................. 3

V.   THE MT. SOLEDAD WAR MEMORIAL IS A MULTI-
     COMPONENT, FULLY INTEGRATED WAR MEMORIAL
     THAT COMMEMORATES ALL WAR VETERANS....................................... 7

VI.  DISTINCTION: STANDING ISSUE vs. CONSTITUTIONAL
     VIOLATIONS ..................................................................................... 9

VII. ISSUES PRESENTED........................................................................ 10

VIII. ARGUMENT..................................................................................... 11

     A. Congressional *Intent* and *Findings* Re: P.L. 109-272 was Not
        To Establish Religion but to Protect a Veteran's War Memorial........................ 11

     B. The Legal *Effect* of P.L. 109-272 Does Not Establish Religion.......................... 13

     C. The Supremacy Clause of the United States Constitution
        Prevents the California Constitution from Being Applied
        To the Mt. Soledad War Memorial................................................................ 14

     D. Plaintiffs Lack Standing to Prosecute this Action......................................... 15

          1. Plaintiffs do Not Have Article III Standing
             Absence of "Case" or "Controversy"........................................... 15

i

# TABLE OF CONTENTS

**Page(s)**

a.  There is no Concrete, Personal, and
    Particularized Injury in Fact........................................     18

b.  There is no Injury Traceable to the Act
    Or to the Mt. Soledad War Memorial..............................     20

c.  Plaintiff's Alleged Injuries are Not
    Redressable Through this Litigation.................................     22

d.  Plaintiffs Lack Standing Under Article III..........................     23

2.  Plaintiffs Standing is Precluded by Prudential
    Considerations.................................................................     23

3.  Plaintiffs do not Have Taxpayer Standing..................................     25

E. Plaintiffs do not Have Standing and Have Failed to State A
   Claim Upon Which Relief Can Be Granted Because the Act
   And the Mt. Soledad War Memorial do not Contravene the
   Establishment Clause, as they Fully Comply with the Recent
   U.S. Supreme Court Decisions in *Van Orden* and *McCreary*
   Regarding Passive Displays of Religious Symbols and Messages
   On Public Property.................................................................     26

1.  *Van Orden* Supports the Finding that Neither the Act Nor
    The Mt. Soledad Memorial Transgresses the Establishment
    Clause.............................................................................     26

2.  *McCreary* Supports the Finding that Neither the Act Nor
    The Mt. Soledad Memorial Transgresses the Establishment
    Clause.............................................................................     28

IX. IF THE COURT DENIES THE MOTION TO DISMISS, THE COURT
    SHOULD CERTIFY THIS MATTER FOR AN IMMEDIATE APPEAL
    TO THE NINTH CIRCUIT COURT OF APPEALS............................     30

X. CONCLUSION...............................................................................     30

ii

1

# TABLE OF AUTHORITIES

2
**Page(s)**

3  *Allen v. Wright*
4      468 U.S. 737, 750 (1984)...........................................   16, 17, 19, 20, 21, 24, 25

5  *Capitol Square Review & Advisory Board v. Pinette*
    515 U.S. 753, 779 (1995)....................................................................   21
6
7  *Colorado River Water Conservation District v. U.S.*
    424 U.S. 800, 820 (1976)....................................................................   16

8  *Diamond v. Charles*
9      476 U.S. 54, 62 (1986)......................................................................   18, 19

10  *Doremus v. Board of Education*
    342 U.S. 429 (1952).........................................................................   25
11
12  *Elk Grove Unified School District v. Newdow*
    542 U.S. 27, 55 (2004)......................................................................   21
13
14  *Frothingham v. Mellon*
    262 U.S. 447, 487 (1923)....................................................................   25

15  *Lujan v. Defenders of Wildlife*
16      504 U.S. 555, 560 (1992)..............................................   15, 17, 18, 20, 23

17  *McCreary v. ACLU*
    125 S.Ct. 2722...................................................................   3, 26, 28, 29, 30
18
19  *Raines v. Byrd*
    521 U.S. 811, 819-820 (1997)...............................................................   16
20
21  *Schlesinger v. Reservists Committee to Stop the War*
    418 U.S. 208, 220 (1974)....................................................................   17

22  *Spector Motor Service, Inc. v. McLaughlin*
23      323 U.S. 101, 105 (1944)....................................................................   16

24  *Steel Co. v. Citizens for a Better Environment*
    523 U.S. 83, 104 (1998).....................................................................   16
25
26  *Valley Forge Christian College v. Americans*
*United for Separation of Church and State, Inc.,*
27      454 U.S. 464, 484 (1982)...........................................   10, 15, 16, 21, 23, 25

28

iii

| | |
|---|---|
| 1 | |

# TABLE OF AUTHORITIES--continued

**Page(s)**

*Van Orden v. Perry*
      125 S.Ct. 2854.............................................................. 3, 26, 27, 28

*Warth v. Seldon*
      422 U.S. 490 (1975)..................................................... 10, 16, 18, 23, 24

# CONSTITUTIONS AND STATUTES

*U.S. Const. art. I, sec. 8*.................................................................... 14

*U.S. Const. art. art II, sec. 2*............................................................ 14

*U.S. Const. art. III, sec. 2, cl. 1*...................................................... *passim*

*U.S. Const. art. VI, cl. 2*.................................................................. 14, 15

*U.S. Const. 1st Amend*.............................................................. 1, 9, 10

Federal Rule of Civil Procedure 12(b)............................................ 1, 30

28 U.S.C. §1292(b)........................................................................ 31

P.L. 109-272; 120 Stat. 770.................................. 10, 11, 13, 23, 24, 30

P.L. 108-447.................................................... 10, 11, 13, 23, 24, 30

Pacific Justice Institute's Memorandum of Points and Authorities in Support of Motion to Dismiss 1st Amended Complaint

I.     **INTRODUCTION:**

This Court may <u>not</u> order removal of any of the individual components of the fully-integrated Mount Soledad National Veterans War Memorial ("Mt. Soledad War Memorial") because this Court has no jurisdiction under Article III to make such an order. *U.S. Const. art. III, sec. 2, cl. 1.*

Specifically, this Court does <u>not</u> have Article III jurisdiction as no justiciable claim exits because:

A. Plaintiffs do <u>not</u> have standing under Article III, as no plaintiff has suffered any constitutionally cognizable injury;

B. Plaintiffs do <u>not</u> have standing under Article III, as no plaintiff has taxpayer standing; and

C. Plaintiffs do <u>not</u> have standing under Article III and have <u>not</u> stated a claim, as the Mt. Soledad War Memorial does not constitute an unconstitutional establishment of religion under the Establishment Clause of the First Amendment.

II.    **RELIEF REQUESTED AND STATUTORY AUTHORITY:**

By way of the instant motion, intervenor and defendant, Pacific Justice Institute, requests this Court to issue an order dismissing the 1st Amended Complaint pursuant to F.R.Civ.P. 12(b)(1) and 12(b)(6) on the following grounds:

A. The 1st Amended Complaint should be dismissed with prejudice pursuant to F.R.Civ.P. 12(b)(1) because this Court lacks jurisdiction over the subject matter, as the claims alleged by plaintiffs are <u>not</u> justiciable under Article III of the United States Constitution; and/or

B. The 1st Amended Complaint should be dismissed with prejudice pursuant to F.R.Civ.P. 12(b)(6) because plaintiffs have failed to state a claim upon which relief may be granted, as there is no constitutional violation under the Establishment Clause of the First Amendment.

**III.   PLAINTIFFS' ALLEGATIONS IN 1ST AMENDED COMPLAINT RE: STANDING:**

The following summary sets forth all of the allegations in the 1st Amended Complaint that plaintiffs assert as their basis for invoking this Court's jurisdiction under Article III of the United States Constitution:

**A.** Plaintiffs are not Christians. (1st Amended Complaint, ¶¶ 3& 4.)

**B.** Plaintiffs served in the U.S. Armed Forces in Vietnam. (1st Amended Complaint, ¶¶ 3& 4.)

**C.** Plaintiffs pay state, local, and federal taxes. (1st Amended Complaint, ¶¶ 3& 4.)

**D.** Plaintiffs "*are offended by a 'war memorial' that sends a message that only Christian war veterans are being honored or remembered.*" (1st Amended Complaint, ¶ 10.)

**E.** Plaintiffs are made to "*feel as if their government is treating them like second class citizens because they are not Christians and is not respecting or honoring their service as Americans, equal to all others who served.*" (1st Amended Complaint, ¶ 10.)

**F.** Plaintiffs are **not** "*comfortable going to Mt. Soledad in the presence of the cross.*" (1st Amended Complaint, ¶ 10.)

**G.** Plaintiffs cannot "*enjoy the publicly owned park their tax dollars support.*" (1st Amended Complaint, ¶10.)

**H.** Plaintiffs are **not** "*comfortable*" at the Mt. Soledad War Memorial because "*it is a sectarian memorial which demonstrates the government's preference for one religion over all other religions and beliefs.*" (1st Amended Complaint, ¶ 10.)

**I.** Plaintiffs would visit the Mt. Soledad War Memorial but for "*the huge cross towering over the memorial*" which they believe "*sends a message to them that their government does not feel their service was as respected or worth as that of Christians that served.*" (1st Amended Complaint, ¶ 10.)

**J.** Plaintiffs **believe** that because they are not Christians the United States' ownership and maintenance of the Mt. Soledad War Memorial will result in them being *"treated as outsiders, second class citizens and not respected for the service they provided their country."* (1st Amended Complaint, ¶ 28.)

**K.** Plaintiffs **believe** that they *"cannot comfortably enjoy the park or the memorial because they are not Christians."* (1st Amended Complaint, ¶ 28.)

**L.** Plaintiffs **feel** that *"the cross as the centerpiece of the monument communicates to them that the federal government does not feel their service to the country was of equal value as that service provided by Christians."* (1st Amended Complaint, ¶ 28.)

## IV.   RELEVANT FACTUAL BACKGROUND AND SUMMARY OF THE MT. SOLEDAD WAR MEMORIAL AND OTHER NATIONAL WAR MEMORIALS, MONUMENTS, MILITARY PARKS, AND CEMETERIES:

It is undisputed that a cross has stood atop Mt. Soledad in one form or another since 1913, when private citizens placed a redwood cross atop Mt. Soledad (on an approximately 170-acre parcel of land owned by the City of San Diego). In 1916 the land was dedicated as a park by the City of San Diego. In 1952 a wind storm destroyed the cross. In 1954, a private organization, the Mount Soledad Memorial Association, was granted permission by the City of San Diego to erect the cross in its present form for the express purpose of honoring veterans of World War I, World War II, and Korean War.[1]

---

[1] As will be discussed in greater detail below, these facts alone, that a cross in one form or another had been atop Mt. Soledad for 78 years before being challenged in court and that the purpose of the private organization's dedication of the present cross in 1954 was to honor Korean War Veterans, provide the required basis to pass constitutional muster under both of the recent U.S. Supreme Court decisions relating to passive displays of religious symbols on public property. *McCreary County v. ACLU of Kentucky*, 125 S.Ct. 2722 (2005)("*McCreary*") and *Van Orden v. Perry*, 125 S.Ct. 2854 (2005)("*Van Orden*")—the Kentucky and Texas Ten Commandment cases.

Contrary to the plaintiffs' insistence, the 1954 dedication ceremony was not a religious ceremony, but was typical of dedications in that era, including the presentation of the U.S. and military flags by a U.S. Military Color Guard. As can be expected of any dedication of a war memorial, in attendance were civilians and members of the U.S. Armed Forces (in full uniform). (Exh. 1: photographs of 1954 Dedication.)

There is no evidence to support plaintiffs' assertion that the 1954 Dedication of the Mt. Soledad War Memorial was to commemorate only Christian veterans. In fact the evidence is to the contrary, as there is a large Dedication Plaque attached to the base of the cross in plain sight where it can be seen and read by everyone who visits the War Memorial. It unequivocally states that the cross was dedicated to **all** men and women veterans of all branches of the U.S. Armed Forces. The Dedication Plaque, which was attached to the base of the Mt. Soledad War Memorial in 1989 by the Mount Soledad Memorial Association, reads as follows:

> "MT. SOLEDAD VETERANS MEMORIAL CROSS
> DEDICATED IN 1954, AS A TRIBUTE TO ALL
> BRANCHES OF THE ARMED SERVICES OF U.S.A. SERVICEMEN AND WOMEN.
> THIS PLAQUE DEDICATED
> NOVEMBER 11, 1989
> MT. SOLEDAD MEMORIAL ASSOCATION
> CITY BEAUTIFUL SAN DIEGO

(Exh. 10: photograph of Dedication Plaque.)

Plaintiffs ignore the fact that just to the South of the Mt. Soledad War Memorial stands another National Memorial that displays a cross, which was erected the very same year as the first cross atop Mt. Soledad. Specifically, in 1913 President Woodrow Wilson designated the Cabrillo National Monument atop the southern most portion of Pt. Loma. (Exh. 2: *Listing of Presidentially Designated Monuments*, The Wilderness Society (2001), p. 3.) The Cabrillo National Monument

1    is comprised of a tall statute of Juan Rodriquez Cabrillo, above which there is a cross. (Exh. 3:

2    Photograph of Cabrillo Monument and Monument Sign.)

3        Also located on Pt. Loma is the Fort Rosecrans National Cemetery. Throughout the Ft.

4    Rosecrans are private memorials appearing on property owned by the United States that contain

5    religious symbols, scriptures, and prayers. For example, Stars of David and Christian crosses are

6    commonplace in National Cemeteries such as Ft. Rosecrans. (Exh. 4: Photographs of headstones

7    bearing Jewish and Christian religious symbols at the Ft. Rosecrans Cemetery.) Another example

8    is in a large U.S Navy memorial monument honoring men lost in the enemy sinking of the U.S.S.

9    Gambier Bay during World War II, bears the following prominently displayed prayer:

10

11 <div align="center">

*"ETERNAL GOD*

*WHO ALONE SPREADS OUT THE HEAVENS AND RULES THE RAGING SEAS, MAY*
*THIS MEMORIAL BRING CONTINUED REMEMBERANCE OF THE ONE HUNDRED*
*AND THIRTY SEVEN MEN WHO DIED DEFENDING THEIR COUNTRY IN TIME OF*
*DANGER, AND WHOSE BODIES FOUND, THEIR LAST RESTING PLACE IN THE WATERS*
*OF THE PACIFIC, MAY IT CALL TO MIND THAT THEY WERE CALLED*
*BY THEIR NATION TO DEFEND THE LIBERTIES AND PRESERVE UNITY.*
*WE DO NOT WANT THOSE WHO DIED IN AIR AND SEA BATTLES OFTEN*
*AGAINST HOPELESS ODDS TO HAVE DIED IN VAIN. THEY DIED THAT WAR*
*WOULD END, AN AGGRESSOR WOULD BE STOPPED, THAT PEACE WOULD COME*
*TO MAKE THE WORLD SAFE FOR THEIR FAMILIES AND GENERATIONS TO COME*
*IN THE NAME OF OUR LORD. AMEN"*

</div>

22    (Exh. 5: Photograph of U.S.S. Gambier Bay Memorial in Ft. Rosecrans Cemetery.) It should be

23    noted that the Memorial bears not only the foregoing prayer, but also the U.S. Government's

24    imprimatur in the form of the Presidential Citation and the Official Seal of the U.S. Navy,

25    although the Memorial was erected and dedicated by the families of the men who died on the

26

27    U.S.S. Gambier Bay.

28

Of course it should come as no surprise that national monuments such as Mt. Soledad, Cabrillo, and Ft. Rosecrans that contain Jewish, Christian, and other religious symbols and prayers exist throughout our nation. The following is just a short summary of those federally owned locations that contain stand-alone crosses.

Serving as a National Historical Monument (administered by the National Park Service), a large granite cross was erected in 1938 by the Daughters of the American Colonists at Cape Henry, Virginia. The Cape Henry Memorial Cross commemorated the approximate location where the Jamestown settlers first landed in 1607. Interestingly, the Cape Henry Memorial Cross was erected in the very location where those early settlers had erected a wooden cross in 1607. (Exh. 6: Photograph of the Cape Henry Memorial Cross.)

Two more examples come from the Arlington National Cemetery.

First, the Canadian Cross of Sacrifice, which is a 24-foot high stand-alone granite cross, was dedicated in 1927. (Exh. 7: Photograph of the Canadian Cross of Sacrifice.) The Canadian Cross of Sacrifice was proposed by the Canadian Prime Minister to commemorate the sacrifice of **all** of the American citizens who enlisted in the Canadian Armed Forces and were killed in World War I. Of note is that the cross in the Canadian Cross of Sacrifice is associated with the concept of the sacrifice of those who fight and die in wars—giving the ultimate sacrifice—which is precisely the message intended and conveyed by the cross that is part of the Mt. Soledad War Memorial.

Second, to commemorate those soldiers who were killed and originally buried in France during World War I but later moved to Arlington, the Argonne Unit of the American Women's Legion erected and dedicated the stand-alone Argonne Cross. The inscription in the base of the Argonne Cross reads:

*"IN MEMORY OF OUR MEN IN FRANCE*
*1917 1918"*

1  (Exh. 8: Photograph of the Argonne Cross.)  Obviously, the Argonne Cross commemorates **all** of

2  those soldiers who gave their lives in France and were later moved to Arlington, not just

3  Christians.

4  Fittingly, the final example comes from the Battlefield at Gettysburg, where all of those

5  thousands of men, Christian, Jewish, and Atheist soldiers alike, gave their lives so that future

6  generations might live in freedom. On July 2, 1888, the 63rd, 69th, and 8th New York Infantry

7

8  dedicated the large stand-alone bronze and granite cross on the Gettysburg Battlefield, located in

9  the Gettysburg National Military Park. This monument is known as the Irish Brigade Monument.

10  (Exh. 9: Photograph of Irish Brigade Monument at Gettysburg.)

11  Plaintiffs wish for the world to see the Mt. Soledad War Memorial through the tunnel

12  vision through which they see it, to wit: as a memorial to only Christian veterans. If this were

13

14  permitted, then this Court, along with the U.S. District Courts in Gettysburg, Arlington, and every

15  other federal district throughout the country, would be required to issue orders removing all

16  crosses from all national war memorials, monuments, national military parks, and cemeteries.

17  Fortunately for our Nation and for those to whom these war memorials have been erected and

18  dedicated, such is not the law of land.

19

20

21  V.    **THE MT. SOLEDAD WAR MEMORIAL IS A MULTI-COMPONENT, FULLY**

22  **INTEGRATED WAR MEMORIAL THAT COMMEMORATES ALL WAR**

23  **VETERANS:**

24  The Mt. Soledad War Memorial is a multi-component, fully integrated national war

25  memorial that commemorates all war veterans. As mentioned in the preceding section, *supra*, the

26  Mt. Soledad War Memorial has a Dedication Plaque that makes clear to anyone who visits that the

27

28

Memorial is dedicated to all men and women who served in the U.S. Armed Forces. (Exh. 10:
photograph of Dedication Plaque.) Generally, the Mt. Soledad War Memorial is comprised of the
following main components:

    **A.** a 26 foot tall white concrete cross (Exh. 11: Photograph of Side View of all components of
       Mt. Soledad War Memorial);

    **B.** a flag pole with the U.S. Flag (Exh. 11);

    **C.** Dedication Plaque (Exh. 10);

    **D.** Six concentric walls containing over 1,800 black granite plaques bearing the names and
       information of individuals who have served in the U.S. Armed Force—eventually there
       will be a total of 3,200 plaques (Exh. 11; Exh. 12: Legend of Mt. Soledad War
       Memorial—the white cross located in the middle, with the six concentric walls
       surrounding the North, South, and West sides of cross);

    **E.** twenty-three bollards numbered 1-23 on the lower-level of the Memorial (Exhs. 11, 12,
       and 13: photograph showing example bollard and dedication);

    **F.** benches dedicated to individuals positioned around the outside perimeter of the Memorial
       (Exhs. 11 and 14: photograph showing example bench and dedication); and

    **G.** brick pavers with names engraved of honored veterans (Exhs. 12 and 15: photograph of
       one area of brick pavers showing names of honored veterans).

    The black granite plaques that are mounted to the walls surrounding the base of the cross
contain information about veterans that includes: their name, the branch of service, religious
symbols, scripture, prayers, and other information specific to each honoree. As to the religious
component of the plaques, there are no restrictions based on religious affiliation or lack of
religious beliefs. In fact, it is not unusual to see plaques honoring Jewish and Christian veterans

side-by-side with their respective religious icon etched into their plaques. (See, for example, Exh. 16: Photograph of plaques with both the Star of David and the Cross.)

Many of the plaques contain statements honoring God and scriptures quoted along with the other information about the honorees. For example:

*"GOD BLESS AMERICA"*

*"...for the son of man came not to be served but to serve... Matt, 20:28"*

*"He who hears My words and believes in Him who sent Me has eternal life and shall not receive judgment. John 5:24."*

(Exh. 17: Photographs of 3 plaques containing blessings to God and scripture.)

So diverse is the Mt. Soledad War Memorial that there is an entire section of the North-West Wall that is dedicated to veterans from the Barona Group of the Capitan Grande Band of Indians. (Exh. 18: Photograph of North-West Wall containing Barona Plaques.)

Finally, many of those who visit the Mt. Soledad War Memorial consider it to be of such importance that they bring flowers, flags, and other items to place by the plaques of their loved ones, much like those items that are placed on graves at a the National Cemeteries. (Exh. 19: Photograph of flowers and U.S. Flag below plaques.)

## VI.    DISTINCTION: STANDING ISSUE vs. CONSTITUTIONAL VIOLATIONS:

When assessing whether a particular party has constitutional standing in order to invoke Article III review, a district court must be careful not to conflate the threshold issue of standing with the ultimate substantive issue presented to the court. That is to say, a plaintiff's standing can only rest on concrete injury—the issue of whether the government action does or does not violate the Establishment Clause is a separate question that is only reached once the plaintiff has satisfied

Article III standing requirements. As the Supreme Court held in *Warth v. Seldon*, 422 U.S. 490

(1975)("*Warth*"), standing "*in no way depends on the merits of the plaintiff's contention that*

*particular conduct is illegal.*" *Id.* at 500. Rather, the complaint must identify some action by the

government that affects the *plaintiff's* particularized legal rights concretely and imminently—

regardless of whether that action ultimately is found to be lawful or not:

> "*The requirement of standing 'focuses on the party seeking to get his complaint*
>
> *before the federal court and **not on the issues he wishes to have adjudicated.**'*"

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454

U.S. 464, 484 (1982)("*Valley Forge*")(emphasis added).

Finally, even if this court were to assume that the Mt. Soledad War Memorial transgressed

the Establishment Clause, the plaintiffs must still satisfy the standing requirements—if not, then

the case must be dismissed because this court does **not** have jurisdiction under Article III. U.S.

Const. art. III, sec. 2, cl. 1; *Valley Forge* and *Warth*, *supra*.

## VII.    ISSUES PRESENTED:

Simply stated, the issues raised by way of the instant motion are:

**A.** Do plaintiffs have constitutional standing to invoke this Court's jurisdiction under

Article III of the United States Constitution?

**B.** If so, whether the Establishment Clause of the First Amendment allows the display of

a fully integrated national war memorial that includes as one of many components a

large cross on property owned by the United States of America.

/////

VIII.   ARGUMENT:

A. CONGRESSIONAL *INTENT* AND *FINDINGS* RE: P.L. 109-272 WAS NOT TO
   ESTABLISH RELIGION BUT TO PROTECT A VETERANS WAR MEMORIAL:

In the introduction to P.L. 109-272, Congress stated the purpose of the Mt. Soledad Veterans Memorial Preservation Act (the "Act"):

> "*To preserve the Mt. Soledad Veterans Memorial in San Diego, California, by providing for the immediate acquisition of the memorial by the United States.*"

P.L. 109-272; 120 Stat. 770.

It is important to note that Section 2(a) of the Act also states that the purpose of the Act was to "effectuate the purpose of section 116 of division E of Public Law 108-447." Sec. 2(a), P.L. 109-272; sec. 2(a), 120 Stat. 770. Specifically, Public Law 108-447 was the 2004 Act of Congress that designated the Mt. Soledad War Memorial as a National Veterans Memorial:

> *"The Mt. Soledad Veterans Memorial located within the Soledad Natural Park in San Diego, California, which consists of a 29 foot-tall cross and surrounding granite memorial walls containing plaques engraved with the names and photographs of veterans of the United States Armed Forces, is hereby designated as a national memorial honoring veterans of the United States Armed Forces."*

Sec. 116(a), P.L. 108-447; sec. 116(a) 118 Stat. 2809 (emphasis added).

Upon passing by **unanimous** consent in the U.S. Senate (including full support by California Senators Feinstein and Boxer), the Senate Majority Leader rose to express the intent and purpose of the Act:

> "Mr. President, I want to pause for a moment and comment on the bill we just passed. I am proud that the Senate, in this bill, is choosing to protect an important memorial that honors our Nation's fallen veterans. With the passage of this legislation, the Mt. Soledad Veterans Memorial Protection Act--this memorial being in San Diego, CA—I believe we pay a real tribute to our fallen veterans. This memorial will be controlled, with this legislation, by the Federal Government, which will ensure that the men and women it memorializes will continue to be so

honored. The memorial is very important to our veterans. It is a key symbol of our religious freedom."

Cong.Rec. August 1, 2006, p. S8550.

Similarly, the President supported passage of the Act while it was pending as H.R. 5683 in the House of Representatives:

> "The Administration strongly supports passage of H.R. 5683 to protect the Mount Soledad Veterans Memorial in San Diego. In the face of legal action threatening the continued existence of the current Memorial, the people of San Diego have clearly expressed their desire to keep the Mt. Soledad Veterans Memorial in its present form. Judicial activism should not stand in the way of the people, and the Administration commends Rep. Hunter for his efforts in introducing this bill. The bill would preserve the Mount Soledad Memorial by vesting title to the Memorial in the Federal government and providing that it be administered by the Secretary of Defense. The Administration supports the important goal of preserving the integrity of war memorials."

(Exh. 20: 7/19/06 Statement of Administration Policy re: H.R. 5683.)

In passing the Act, Congress made the following legislative findings regarding the history and purpose of the Mt. Soledad War Memorial:

> "(1) The Mt. Soledad Veterans Memorial has proudly stood overlooking San Diego, California, for over 52 years as a tribute to the members of the United States Armed Forces who sacrificed their lives in the defense of the United States.
> (2) The Mt. Soledad Veterans Memorial was dedicated on April 18, 1954, as 'a lasting memorial to the dead of the First and Second World Wars and the Korean conflict' and now serves as a memorial to American veterans of all wars, including the War on Terrorism.
> (3) The United States has a long history and tradition of memorializing members of the Armed Forces who die in battle with a cross or other religious emblem of their faith, and a memorial cross is fully integrated as the centerpiece of the multi-faceted Mt. Soledad Veterans Memorial that is replete with secular symbols.
> (4) The patriotic and inspirational symbolism of the Mt. Soledad Veterans Memorial provides solace to the families and comrades of the veterans it memorializes.
> (5) The Mt. Soledad Veterans Memorial has been recognized by Congress as a National Veterans Memorial and is considered a historically significant national memorial."

Sec. 1, P.L. 109-272; sec. 1, 120 Stat. 770.

1    Nothing in the Congressional Record or the Act even remotely suggests that Congress and

2    the President's intent and purpose in passing the Act was to establish religion. To the contrary,

3    their intent was clearly expressed: to *"preserve"* the Mt. Soledad War Memorial as *"a historically*

4    *significant national memorial"* and to designate *"a national memorial honoring veterans of the*

5    *United States Armed Forces."* Sec. 1, P.L. 109-272 and Sec. 116(a), P.L. 108-447, respectively.

6

7

8    **B.  THE LEGAL *EFFECT* OF P.L. 109-272 DOES NOT ESTABLISH RELIGION:**

9    As described by the Congressional Research Service, the legal effect of the Act can be

10   summarized as follows:

11       1.  Vests in the United States all right, title, and interest to, and the right to immediate

12           possession of, the Mt. Soledad War Memorial in San Diego, California, to provide

13           for its preservation as a national war memorial honoring veterans;

14

15       2.  Requires the United States to pay just compensation to the current owner of such

16           property; and

17       3.  Prohibits expanding the Mt. Soledad War Memorial's boundaries, upon acquisition

18           by the United States.

19   Sec. 2, P.L. 109-272; sec. 2, 120 Stat. 770.

20   /////

21   /////

22   /////

23   /////

24   /////

25   /////

26

27

28

C. **THE SUPREMACY CLAUSE OF THE UNITED STATES CONSTITUTION**

   **PREVENTS THE CALIFORNIA CONSTITUTION FROM BEING APPLIED TO THE**

   **MT. SOLEDAD WAR MEMORIAL**

Clearly, plaintiffs want this Court to apply the No Preference and No Aid Clauses of the California Constitution. (1ˢᵗ Amended Complaint, ¶¶ 1, 10, 14, 16, 17, 26, 30, 37, and 39 and Prayer, ¶ 1.) In this regard, plaintiffs want this Court to apply California law rather than federal law because both *McCreary* and *Van Orden* do not support a finding that the Mt. Soledad War Memorial is unconstitutional. However, the Supremacy Clause precludes this court from applying the California Constitution to void an Act of Congress (here, P.L. 109-272):

> *"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."*

*U.S. Const. art. VI, cl. 2.*

Imagine the state of federal affairs in the area of National Monuments if each state was able to control National War Memorials such as the Mt. Soledad War Memorial. Each state would be able to frustrate the honoring of individuals who served in the U.S. Armed Forces for whatever political reason they saw fit. In fact, much like the banning of military recruitment at public universities, states or local governments could ban any memorials honoring veterans of the U.S. Armed Forces.

It is constitutionally dispositive that the U.S. Armed Forces do not come under the jurisdiction or regulation of state law, but rather is under the exclusive and plenary power of the federal government. *See, e.g., U.S. Const. art. I, sec. 8, and art II, sec. 2.* So too are national war

memorials such as the Mt. Soledad War Memorial, which honors living and deceased members of the U.S. Armed Forces.

Finally, as a consequence of the Supremacy Clause's bar in this case to the assertion of the No Preference and No Aid Clauses of the California Constitution, all previous federal and state court decisions relating to the Mt. Soledad War Memorial are of no legal consequence in this case, and, therefore, must not be considered. Specifically, in the 1st Amended Complaint plaintiffs attempt to invoke this Court's jurisdiction derivatively through previous federal and state court decisions. (See, e.g., 1st Amended Complaint, ¶¶ 16, 21, 22, & 27.) As those decisions are based exclusively on the No Preference and No Aid Clauses of the California Constitution, this Court may not consider them when analyzing whether plaintiffs have standing and when analyzing the constitutionality of the Act. Accordingly, the No Preference and No Aid Clauses of the California Constitution may not be applied for any purpose in this case. *U.S. Const. art. VI, cl. 2.*

## D.   PLAINTIFFS LACK STANDING TO PROSECUTE THIS ACTION

### 1. Plaintiffs Do Not Have Article III Standing—Absence of "Case" or "Controversy":

The *"judicial power of the United States defined by Article III is not an unconditioned authority to determine the constitutionality of legislative or executive acts,"* but is limited to the resolution of actual *"cases"* and *"controversies." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982)("*Valley Forge*"). "[T]*he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)("*Lujan*").

In federal cases, standing is the initial inquiry:

1   "[Standing] *is the threshold question in every federal case, determining the power*

2   *of the court to entertain the suit.*"

3   *Warth, supra*, 422 U.S. at 499. The issue of standing is designed to discern whether "*the litigant*

4   *is entitled to have the court decide the merits of the dispute or of particular issues.*" *Id.* at 498.

5   The standing requirement is political in nature and is born partly of:

6   "an idea, which is more than an intuition but less than a rigorous and explicit
7   theory, about the constitutional and prudential limits to the powers of an unelected,
    unrepresentative judiciary in our kind of government."
8

9   *Allen v. Wright*, 468 U.S. 737, 750 (1984)("*Allen*"). There is a balance that needs to be struck

10  between "*the heavy obligation to exercise jurisdiction,*" *Colorado River Water Conservation*

11  *District v. U.S.*, 424 U.S. 800, 820 (1976), and the "*deeply rooted commitment not to pass on*

12  *questions of constitutionality*" unless adjudication is necessary. *Spector Motor Service, Inc. v.*

13  *McLaughlin*, 323 U.S. 101, 105 (1944).

14      The party invoking the jurisdiction of federal courts bears the burden of establishing that

15  standing exists. *See, e.g., Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 104 (1998).

16      In a case such as the one at Bar, where the constitutionality of an act of Congress is called

17  into question, the Supreme Court has held that the:

18  "*standing inquiry has been especially rigorous* [where] *reaching the merits of the*
19  *dispute would force* [the judiciary] *to decide whether an action taken by one of the*
    *other two branches of the Federal Government was unconstitutional.*"
20

21  *Raines v. Byrd*, 521 U.S. 811, 819-820 (1997). Similarly, in *Valley Forge* the Supreme Court held

22  that a court's attention must be most keenly focused on the standing issue when it is asked to

23  "*accept for adjudication claims of constitutional violation by other branches of government.*"

24  *Valley Forge, supra*, 454 U.S. at 474-474.

25      Consistent with the foregoing principles, the Supreme Court's standing jurisprudence

26  contains two strands: (a) Article III standing, which applies the "case" or "controversy"

27

28

1    requirement, *Lujan, supra,* 504 U.S. at 559-562; and prudential standing, which applies "*judicially*

2    *self-imposed limits on the exercise of federal jurisdiction,*" *Allen, supra,* 468 U.S. at 751. The

3    Article III standing requirements will be addressed in this section, whereas the prudential standing

4    considerations will be addressed in the following subsection, *infra.*

5

6           To have standing under Article III, first the plaintiff "*must have suffered an injury in fact—*

7    *an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual*

8    *and imminent, not conjectural or hypothetical.*" *Lujan, supra,* 504 U.S. at 560. That is to say the

9    basis alleged in the complaint for standing must be more than the mere "general averments" and

10   "conclusory allegations," which are inadequate to establish Article III standing. *Lujan v.*

11   (1990)("*National Wildlife Federation*"). This requirement is generally strict. For example, in

12   environment cases, where the harm is more widespread, a plaintiff must demonstrate a specific

13   and particularized injury to their unique interest. *Id.*

14

15          "*Second, there must be a causal connection between the injury and the conduct*

16   *complained of...*" *Id.* In particular, "*the injury has to be 'fairly...trace*[able] *to the challenged*

17   *action of the defendant, and not...the result* [of] *the independent action of some third party not*

18   *before the court.*'" *Id.*

19

20          "*Third, it must be likely, as opposed to merely speculative, that the injury will be redressed*

21   *by a favorable decision.*" *Id.*

22          The predominating principle supporting standing is that "*standing to sue may not be*

23   *predicated upon an interest of the kind...which is held in common by all members of the public,*

24   *because of the necessarily abstract nature of the injury all citizens share.*" *Schlesinger v.*

25   *Reservists Committee to Stop the War,* 418 U.S. 208, 220 (1974). This is because general

26   grievances asserted by those who lost in the legislative process are not actionable under Article III:

27

28

Pacific Justice Institute's Memorandum of Points and Authorities in Support of Motion to Dismiss 1st Amended Complaint

-17-

"[A] *plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.*"

*Lujan, supra*, 504 U.S. at 573-574. Similarly, in *Warth* the Supreme Court held:

"[W]*hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant the exercise of jurisdiction.*"

*Warth, supra*, 422 U.S. at 499.

## A. There is No Concrete, Personal, and Particularized Injury in Fact

In this case, plaintiffs allege their harm to be, for example, that: (1) they are "*offended by a war memorial that sends a message that only Christian war veterans are being honored or remembered;*" (2) they are made to "*feel as if their government is treating them like second class citizens because they are not Christians and is not respecting or honoring their service as Americans, equal to all others who served;*" (3) they are not "*comfortable going to Mt. Soledad in the presence of the cross;*" (4) they cannot "*enjoy the publicly owned park their tax dollars support.*" (1st Amended Complaint, ¶10.)

This type of injury to one's feelings falls short of the type of "*concrete and particularized*" injury "*affect[ing] the plaintiff in a personal and individual way*" that Article III requires. *Lujan, supra*, 504 U.S. at 560 & n. 1. More importantly, the "*psychological consequence presumably produced by observation of conduct with which one disagrees...is not an injury sufficient to confer standing under Article III, even though the disagreement is phrased in constitutional terms.*" *Valley Forge, supra*, 454 U.S. at 485-486. However, absent some "*concrete and particularized*" injury, the plaintiffs' disagreement with the Act and the fully integrated Mt. Soledad War Memorial cannot create standing. *Diamond v. Charles*, 476 U.S. 54, 62 (1986)("*Diamond*"). As

1  the Supreme Court made clear in *Diamond*: *"The presence of a disagreement, however sharp and*

2  *acrimonious it may be, is **insufficient** by itself to meet Art. III's requirements." Id.* (emphasis

3  added).

4     Additionally, plaintiffs allege that they will be *"treated as outsiders, second class citizens*

5  *and not respected for the service they provided their country,"* (1st Amended Complaint, ¶24).

6  This allegation, however, fares no better because *"abstract stigmatic injury"* is insufficient to

7  create Article III injury, and simply tracking standard verbiage from the Supreme Court's

8  Establishment Clause jurisprudence does *not* magically confer standing. *Allen, supra,* 468 U.S. at

9  755-756.

10    Besides the fact that the Mt. Soledad War Memorial does not send the messages claimed

11  by plaintiffs and does not create the injury alleged, plaintiffs are simply making general, subjective

12  statements of their feelings, rather than identifying *"concrete and particularized"* harm they

13  sustained. These types of allegations are nothing but *"general averments"* and *"conclusory*

14  *allegations,"* which are inadequate to establish Article III standing. *National Wildlife Federation,*

15  *supra,* 497 U.S. at 889.

16    The following are examples of what would constitute *"concrete and particularized"* injury

17  that would affect a plaintiff in a *"personal and individual"* way:

18  **a.** A war veteran who is an Atheist is told that he may not visit the Mt. Soledad War

19     Memorial because his is not a religious person.

20  **b.** A Jewish person tries to buy a Memorial Placard on the Mt. Soledad War Memorial with a

21     Star of David engraved upon it but is denied because the icon is religious, whereas a

22     Christian is permitted to have a cross engraved on his placard.

**c.** A Christian person wishes to engrave a prayer on his Memorial Placard that praises Jesus but is denied because the prayer is a religious expression, while a Muslim person is permitted to engrave "*praise Allah*" on her placard.

**d.** A Muslim person is denied from engraving a verse from the Koran on her father's grave marker because of its religious character, whereas a Jewish person is permitted to engrave the 23rd Psalm on his wife's grave marker.

**e.** A government official orders the removal of the Ten Commandments from a Jewish person's Memorial Placard on Mt. Soledad War Memorial because it is religious in nature, whereas all placards containing crosses are permitted to remain intact.

The foregoing provides examples of what would actually constitute Article III injury under the Establishment Clause. In contrast to the foregoing, the plaintiffs have suffered nothing but contrived harm for the express purpose of manufacturing standing in order to enlist this Court to destroy the fully integrated Mt. Soledad War Memorial. Accordingly, the Court should find that plaintiffs have not satisfied the standing requirements for Article III.

**B. There is No Injury Traceable to the Act or the Mt. Soledad War Memorial**

The second requirement of Article III standing is that there must be "*a causal connection between the injury and the conduct complained of.*" That is to say, the alleged injury is "fairly trace[able] to the challenged action of the defendant, and not…th[e] result [of] the independent action of some third party." *Lujan, supra*, 504 U.S. at 560.

As demonstrated in the preceding subsection, plaintiffs have failed to identify any "*concrete and particularized*" injury. Consequently, the plaintiffs' failure to allege injury that is more tangible than "*abstract stigmatic injur*[ies]" means that such injuries are "*not fairly traceable to the Government conduct*" complained of in plaintiffs' 1st Amended Complaint. *Allen, supra*,

468 U.S. at 755-757. Even a detailed review of the 1st Amended Complaint supports this conclusion as none of the standing allegations emanates from the Act or the Mt. Soledad War Memorial, rather the harm alleged emanates from plaintiffs' own minds (i.e., they "*feel*," they are "*offended*," they feel "*uncomfortable*," etc.). Accordingly, there is no causal connection because there is no harm in the first place. *Id.*; *see, also: Valley Forge, supra,* 454 U.S. at 485-486; *National Wildlife Federation, supra,* 497 U.S. at 889.

Justice O'Connor addressed individuals such as the plaintiffs in this case, characterizing them as "*isolated nonadherents*":

> "[T]he endorsement inquiry is **not** about the perceptions of particular individuals or saving *isolated nonadherents* from the discomfort of viewing symbols of a faith to which they do not subscribe."

*Capitol Square Review & Advisory Board v. Pinette,* 515 U.S. 753, 779 (1995)("*Capitol Square*")(O'Connor, J., concurring; emphasis added). In essence, what plaintiffs are asking this Court to do is provide them with a *heckler's veto* as a weapon to enforce their *subjective* feelings and desires for the express purpose of destroying a fully integrated war memorial:

> "Given the dizzying religious heterogeneity of our Nation, adopting a *subjective* approach would reduce the test to an *absurdity. Nearly any government action could be overturned as a violation of the Establishment Clause if a 'heckler's veto' sufficed to show that its message was one of endorsement.*"

*Elk Grove Unified School District v. Newdow,* 542 U.S. 27, 55 (2004)(O'Connor, J., concurring; emphasis added). Neither the Act nor the Mt. Soledad War Memorial has done anything to cause plaintiffs any constitutional injury—it is simply a long-standing passive, multi-component, fully integrated War Memorial located on public land, which was erected and dedicated by a private organization. This is no different than: the Cabrillo Monument (Exh. 3), Ft. Rosecrans National Cemetery (Exhs. 4 & 5), the Cape Henry Memorial Cross (Exh. 6), the Canadian Cross of

1    Sacrifice at Arlington (Exh. 7), the Argonne Cross at Arlington (Exh. 8), and the Cross at the

2    Gettysburg National Military Park (Exh. 9). The Act simply makes the entire Mt. Soledad War

3    Memorial a national war memorial—it is not an establishment or endorsement of religion by the

4    federal government.

5

6        Based on the foregoing, it should be clear that there is no causal connection between the

7    Act or Mt. Soledad War Memorial and any contrived injury. This is because plaintiffs, as *isolated*

8    *non-adherents*, are trying to have this Court act upon their subjective, non-actionable feelings and

9    desires, which does not constitute Article III standing. *Lujan*, *supra*, 504 U.S. at 560; *see*, *also:*

10   *Valley Forge*, *supra*, 454 U.S. at 485-486; *National Wildlife Federation*, *supra*, 497 U.S. at 889.

11       **C.   Plaintiffs' Alleged Injuries Are Not Redressable Through this Litigation**

12

13       The redressability of injury prong of the Article III standing requirement "examines the

14   causal connection between the alleged injury and the judicial relief requested." *Allen*, *supra*, 468

15   U.S. at 753 n. 19. In this regard, plaintiffs lack standing because in addition to absence of

16   *"concrete and particularized"* injury in fact that is *"fairly traceable"* to the Act or Mt. Soledad

17   War Memorial, plaintiffs have failed to establish that they are *"likely"* to be *"redressed by a*

18   *favorable decision." Lujan*, *supra*, 504 U.S. at 560.

19

20       The cornerstone of plaintiffs' case is that they would like the constitutional status under the

21   California Constitution to apply to the Act and the Mt. Soledad War Memorial. This, however, is

22   precluded by the Supremacy Clause (*see*, Section VIII.C, *supra*). Consequently, this case is

23   governed by the U.S. Constitution. In this regard, Pacific Justice has not found any instance in the

24   history of this Nation where a national war memorial, monument, military park, or cemetery has

25   been declared unconstitutional under the Establishment Clause.

26

27

28

---

1   As stated above, the Act was passed to "*preserve*" the Mt. Soledad War Memorial as "*a*

2   *historically significant national memorial*" and to designate "*a national memorial honoring*

3   *veterans of the United States Armed Forces.*" Sec. 1, P.L. 109-272 and Sec. 116(a), P.L. 108-447,

4   respectively. The act of taking and declaring property to be a national monument, war memorial,

5   military park, or cemetery is one reserved to the exclusive province of Congress and the President,

6   not the Judiciary. As there are no remedies that this Court may constitutionally employ in this case

7   (including the declaratory and injunctive relief requested in the 1st Amended Complaint), plaintiffs

8   have failed to establish that their injuries are redressable through this litigation, even assuming,

9   *arguendo*, that plaintiffs alleged injuries were constitutionally actionable (which, as demonstrated

10  above, they are not).

11  ### D.  Plaintiffs Lack Standing  Under Article III

12  As the foregoing demonstrates, plaintiffs have failed to establish standing under the "*case*"

13  or "*controversy*" requirements of Article III. *Lujan*, *supra*, 504 U.S. at 560; *see, also: Valley*

14  *Forge*, *supra*, 454 U.S. at 485-486; *National Wildlife Federation, supra,* 497 U.S. at 889; *Allen,*

15  *supra*, 468 U.S. at 753 n. 19.

16  ### 2.  Plaintiffs' Standing Is Precluded By Prudential Considerations:

17  In addition to the foregoing constitutional aspects of standing, there are prudential

18  considerations that must be considered by this Court:

19  > "*Beyond the constitutional requirements, the federal judiciary has also adhered to*
> *a set of prudential principles that bear on the question of standing.*"

20  *Valley Forge*, *supra*, 454 U.S. at 474.

21  The Supreme Court has identified three prudential standing requirements, any one of

22  which will permit courts to <u>refuse</u> to exercise jurisdiction, even where the "*case*" or "*controversy*"

23  requirements of Article III are satisfied. *Warth*, *supra*, 422 U.S. at 499. In this regard, the Supreme

---

Pacific Justice Institute's Memorandum of Points and Authorities in Support of Motion to Dismiss 1st Amended Complaint

1  Court has explained that the prudential considerations that bar the exercise of jurisdiction include

2  any of the following:

3      *"the general prohibition on a litigant's raising another person's legal rights, the*
4      *rule barring adjudication of generalized grievances more appropriately addressed*
       *in the representative branches, and the requirement that a plaintiff's complaint fall*
5      *within the zone of interests protected by the law invoked."*

6  *Allen, supra,* 468 U.S. at 751. The Supreme Court has also explained the reasoning underlying this

7  judicially created limitation upon the exercise of jurisdiction:

8      *"Without such limitations—closely related to Art. III concerns but essentially*
9      *matters of judicial self-governance—the courts would be called upon to decide*
       *abstract questions of wide public significance even though other governmental*
10     *institutions may be more competent to address the questions and even though*
11     *judicial intervention may be unnecessary to protect individual rights."*

12 *Warth, supra,* 422 U.S. at 500.

13     As mentioned in greater detail above, plaintiffs are seeking the redress of "*general*

14 *averments*" and "*conclusory allegations*," which are inadequate to establish Article III standing.

15 Furthermore, pursuant to their respective constitutional powers under the Constitution, Congress

16 and the President saw fit to act (as did the Supreme Court) in order to permanently protect the Mt.

17 Soledad War Memorial. Congress' intent was clearly stated in the Act, which was passed to

18 "*preserve*" the Mt. Soledad War Memorial as "*a historically significant national memorial*" and

19 to designate "*a national memorial honoring veterans of the United States Armed Forces.*" Sec.

20 1, P.L. 109-272 and Sec. 116(a), P.L. 108-447, respectively. In this regard, Congress and the

21 President are in a better constitutional position to decide (through their legislative and executive

22 powers under Articles I and II, respectively) whether or not to designate a national war memorial

23 such as the Mt. Soledad  War Memorial. This, of course, explains why a national war memorial

24 has never been declared unconstitutional. So too, this Court should not exercise jurisdiction over

25
26
27
28

1  this matter for the foregoing prudential reasons. *Valley Forge, supra*, 454 U.S. at 474; *Warth,*

2  *supra*, 422 U.S. at 499; *Allen, supra*, 468 U.S. at 751.

3  **3. <u>Plaintiffs Do Not Have Taxpayer Standing</u>:**

4      It has been clear for more than three-quarters of a century that taxpayers, as such, lack

5  generalized standing to challenge the constitutionality of governmental action. *See, e.g.,*

6  *Frothingham v. Mellon*, 262 U.S. 447, 487 (1923)("*Frothingham*").

7      In this case, the plaintiffs do ***not*** have taxpayer standing to challenge the constitutionality

8  of the Mt. Soledad War Memorial merely because, as they have alleged, they "*pay state, local,*

9  *and federal taxes.*" *See, e.g., Valley Forge, supra*, 454 U.S. at 477.

10     Similar to this case (only in reverse), in *Valley Forge*, the Supreme Court addressed the

11  issue of whether the respondents in that case had standing to challenge the transfer of property of

12  the United States to a church-based college. In that case respondents contended that the transfer of

13  the property to a religious organization constituted a violation of the Establishment Clause. One

14  basis upon which respondents sought to establish standing was as taxpayers. In *Valley Forge* the

15  Supreme Court found that respondents did <u>**not**</u> have taxpayer standing:

16      "[T]*he expenditure of public funds in an allegedly unconstitutional manner is not an injury*

17      *sufficient to confer standing, even though [respondent] contributes to the public coffers as*

18      *a taxpayer.*"

19  *Id.* at 477.

20      Similarly, in *Doremus v. Board of Education*, 342 U.S. 429 (1952) the Supreme Court

21  addressed the issue of whether taxpayers had standing to challenge a New Jersey law that

22  authorized public school teachers to read passages from the Bible in the classroom. In finding that

23  the parties did <u>**not**</u> have taxpayer standing, the Supreme Court explained:

24      "*This Court has held that the interests of a taxpayer in the moneys of the federal*
        *treasury are too indeterminable, remote, uncertain, and indirect to furnish a basis*

25      *for [standing]...The party who invokes the [court's] power must be able to show*
        *not only that the statute is invalid, but that he has sustained or is immediately in*

26      *danger of sustaining some direct injury as the result of its enforcement, and not*
        *merely that he suffers in some indefinite way in common with people in general.*"

27

28

*Id.* at 433-34.

Based on the foregoing, plaintiffs do not have taxpayer standing to challenge the Act and the Mt. Soledad War Memorial.

**E.    THE PLAINTIFFS DO NOT HAVE STANDING  AND HAVE FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BECAUSE THE ACT AND THE MT. SOLEDAD WAR MEMORIAL DO NOT CONTRAVENE THE ESTABLISHMENT CLAUSE, AS THEY FULLY COMPLY WITH THE RECENT U.S. SUPREME COURT DECISIONS  IN *VAN ORDEN* AND *McCREARY* REGARDING PASSIVE DISPLAYS OF RELIGIOUS SYMBOLS AND MESSAGES ON PUBLIC PROPERTY**

The constitutionality of the Act and the Mt. Soledad War Memorial are governed by the Supreme Court's recent decisions in *Van Orden* and *McCreary* (the Ten Commandments cases), *supra*, which address passive displays of religious symbols and messages on public property.

As in this case, the issue presented in *Van Orden* was framed as follows:

> *"The question here is whether the Establishment Clause of the First Amendment allows the display of a monument inscribed with the Ten Commandments on the Texas State Capitol grounds. We hold that it does."*

*Van Orden*, *supra*, 125 S.Ct. at 2858.

**1.    *Van Orden* Supports a Finding that Neither the Act Nor the Mt. Soledad War Memorial Transgresses the Establishment Cause**

In *Van Orden* the stand-alone Ten Commandments monument was made of granite and stands 6-feet high and 3-feet wide and is located on 22 acres of the Texas Capitol Grounds, along with 17 other monuments and 21 historical markers. The center section of the Monument contains a nonsectarian version of the text of the Ten Commandments. Above this section there are two tablets containing the Ten Commandments in their Hebrew version. Just below the Hebrew tablets and above the main section is an American eagle grasping the American Flag. Just below the main

section are two Stars of David and the Greek letters Chi and Rho, which represent Christ. At the bottom of the Monument is the inscription of the dedication:

> "PRESENTED TO THE PEOPLE AND YOUTH OF TEXAS BY THE
> FRATERNAL ORDER OF EAGLES OF TEXAS 1961."

(Exh. 21: Photograph of the stand-alone Ten Commandments Monument in *Van Orden*.); *Van Orden*, supra, 125 S.Ct. at 2858-2859.

In the controlling opinion in *Van Orden*, Justice Breyer considered the basic purpose of the Free Exercise and Establishment Clauses to be for the preservation of religious liberty and tolerance. *Id.* at 2871. Moreover, Justice Breyer articulated the danger of removing monuments comprised of religious symbols or containing religious symbols or messages:

> "[removing the Ten Commandments monument] *based primarily upon the religious nature of the tablets' text would, I fear, lead the law to exhibit a **hostility toward religion that has no place in our Establishment Clause traditions**. Such a holding might well encourage disputes concerning removal of longstanding depictions of the Ten Commandments from public buildings cross the Nation. And it could thereby create the very kind of **religiously based divisiveness** that the Establishment Clause seeks to avoid.*"

*Id.* (emphasis added).

Justice Breyer's fear—government hostility toward religion and religiously based divisiveness—is precisely what confronts this Court in this case. Will this Court encourage others to file actions nationwide for removal of stand-alone crosses, stand-alone Ten Commandment monuments, and the like, such as those which are presently located at Cape Henry, Arlington, Gettysburg, and other national parks and war memorials? It is clear that what plaintiffs are asking this Court to do is to provide a textbook example of what "*hostility toward religion*" and "*religiously based divisiveness*" look like. *Id.* It is down this slippery slope this Court must <u>not</u> venture. *Id.*

In *Van Orden*, Justice Breyer concluded that the stand-alone Ten Commandments Monument did <u>not</u> transgress the Establishment Clause because of the long length of time the monument had been on state grounds before it was challenged (40 years) and because although the Ten Commandments convey a clearly religious message they also have a secular component—morality by which to govern ourselves. *Van Orden*, *supra*, 125 S.Ct. at 2870. In the case at Bar, *Van Orden* constrains this Court to a similar finding.

First, the cross atop Mt. Soledad War Memorial had been there in one form or another for 76 years (almost twice Van Orden) before it was challenged. Second, when the Mt. Soledad War Memorial was dedicated in 1954 it was <u>not</u> for the purpose of establishing, advancing, or endorsing religion, but rather for the express purpose of honoring veterans of World War I, World War II, and Korean War. Third, the Mt. Soledad War Memorial is such an excellent multi-component, fully integrated war memorial that is comparable to the world class war memorials located in Washington, DC. Finally, the Act was not passed to establish religion but rather for the express purpose to *"preserve"* the Mt. Soledad War Memorial as *"a historically significant national memorial"* and to designate *"a national memorial honoring veterans of the United States Armed Forces."* Sec. 1, P.L. 109-272 and Sec. 116(a), P.L. 108-447.

Based on the foregoing, *Van Orden* supports a finding that neither the Act nor the Mt. Soledad War Memorial transgresses the Establishment Clause.

## 2. *McCreary* Supports a Finding that Neither the Act Nor the Mt. Soledad War Memorial Transgresses the Establishment Cause

Due to the fact that neither the Act nor the Mt. Soledad War Memorial has a religious purpose, *McCreary* compels the same outcome as *Van Orden*.

Initially, two Kentucky Counties posted large versions of the Ten Commandments on the inside walls of their courthouses—there were no other displays in close proximity of the postings.

1    Shortly thereafter suits were filed in both counties, alleging Establishment Clause violations. After

2    the suits were filed each county posted additional documents. In *McCreary*, before the district

3    court could rule upon the request for injunctive relief the County modified its display to include

4    the following documents along side the Ten Commandments: an excerpt from the Declaration of

5    Independence;  the Preamble to the Constitution of Kentucky; the national motto of "In God We

6    Trust"; a page from the Congressional Record of Wednesday, February 2, 1983, Vol. 129, No. 8,

7    declaring it the Year of the Bible and including a copy of the Ten Commandments; a proclamation

8    by President Abraham Lincoln designating April 30, 1863 a National Day of Prayer and

9    Humiliation; an excerpt from President Lincoln's "Reply to Loyal Colored People of Baltimore

10   upon Presentation of a Bible" reading, "The Bible is the best gift God has ever given to man.";  a

11   proclamation by President Ronald Reagan marking 1983 the Year of the Bible; and    the

12   Mayflower Compact. *McCreary*, *supra*, at 2729-2730.

13       The district court ordered removal of the Ten Commandments. Thereafter, the county

14   again modified the display to include more secular documents, which included: the entire Star

15   Spangled Banner, the Declaration of Independence, the Mayflower Compact, the Bill of Rights,

16   the Magna Carta, the National Motto, the Preamble to the Kentucky Constitution, the Ten

17   Commandments, Lady Justice and a one-page prefatory document entitled "The Foundations of

18   American Law and Government Display." The prefatory description states that the "display

19

20   contains documents that played a significant role in the foundation of our system of law and

21   government." *McCreary*, *supra*, at 2730-2731.

22       In *McCreary*, the Supreme Court concluded that the Ten Commandments must be removed

23   because they were originally displayed for a religious purpose in contravention of the

24   Establishment Clause. In fact, the Supreme Court found that the second display actually served to

25

26   *enhance* that religious purpose because those displays contained even more detailed religious

27

28

1   information and the enabling resolution claimed that it was the *"embodiment of the ethics of*

2   *Christ."* *Id.* at 2739.

3          As demonstrated above, the case at Bar suffers from no such purpose. Briefly, when the

4   Mt. Soledad War Memorial was dedicated in 1954 it was <u>not</u> for the purpose of establishing,

5   advancing, or endorsing religion, but rather for the express purpose of honoring veterans of World

6   War I, World War II, and Korean War. Similarly, the Act was not passed to establish religion but

7   for the express purpose to *"preserve"* the Mt. Soledad War Memorial as *"a historically significant*

8

9   *national memorial"* and to designate *"a national memorial honoring veterans of the United*

10  *States Armed Forces."* Sec. 1, P.L. 109-272 and Sec. 116(a), P.L. 108-447, respectively.

11         Based on the foregoing, *McCreary* also supports a finding that neither the Act nor the Mt.

12  Soledad War Memorial transgresses the Establishment Clause.

13

14  **IX.    IF THE COURT DENIES THE MOTION TO DISMISS, THE COURT SHOULD**

15        **CERTIFY THIS MATTER FOR AN IMMEDIATE APPEAL TO**

16

17        **THE NINTH CIRCUIT COURT OF APPEALS**

18         In the event the Court denies Pacific Justice's motion to dismiss, the Court should certify

19  this case for an immediate appeal to the Ninth Circuit Court of Appeal, as this case *"involves a*

20  *controlling question of law as to which there is a substantial ground for difference of opinion and*

21  *that an immediate appeal from the order may materially advance the ultimate termination of the*

22  *litigation."* 28 U.S.C. §1292(b).

23

24  **X.    CONCLUSION:**

25         Based on the foregoing arguments and authorities, and upon the record in this matter,

26  intervenor and defendant, Pacific Justice Institute, respectfully requests this Court to issue an order

27  dismissing the 1st Amended Complaint in its entirety pursuant to F.R.Civ.P. 12(b)(1) and 12(b)(6).

28

1        In the event the Court is of the opinion that the motion should be denied, then the Pacific

2    Justice Institute respectfully requests the Court to certify this case pursuant to 28 U.S.C. §1292(b)

3    for an immediate appeal to the U.S. Court of Appeals for the Ninth Circuit.

4

5    DATED:  September 14, 2006.          LAW OFFICES OF PETER D. LEPISCOPO

6    

7

8                                    Peter D. Lepiscopo, Esq.,

9

10                                   Attorneys for Intervenor and
     Defendant, **PACIFIC JUSTICE
     INSTITUTE**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28





# Exhibit 1

1   CASE NAME: *TRUNK v. CITY OF SAN DIEGO, et al.*   CASE NO.: 06-CV-1597-BTM

2

3   ## CERTIFICATE OF SERVICE BY U.S. MAIL

4   STATE OF CALIFORNIA, COUNTY OF SAN DIEGO:

5       I am over the age of eighteen years, and not party to this action.  My business address is
6   **2635 Camino del Rio South, Suite 109, San Diego, California 92108**, which is located in the
    County where the mailing described below took place.

7       I am readily familiar with the business practice at my place of business for collection and
8   processing of correspondence for mailing with the United States Postal Service.  Correspondence
    so collected and processed is deposited with the United States Postal Service that same day in the
9   ordinary course of business.

10      On **September 14, 2006**, at my place of business at San Diego, California, the following:

11

12   1.  **PACIFIC   JUSTICE   INSTITUTE'S   MEMORANDUM   OF   POINTS   AND
        AUTHORITIES IN SUPPORT OF MOTION TO DISMISS 1ST AMENDED
13      COMPLAINT**

14   was placed for deposit in the United States Postal service in a sealed envelope, with postage fully
     prepaid, addressed to:
15

16      **JAMES E. McELROY, ESQ.**          **Attorneys for Plaintiffs**
        625 Broadway, Suite 1400
        San Diego, California 92101
17

18      **KEVIN S. WEBB, Assistant  Attorney General**   **Attorneys for United States of America**
        Department of Justice                              **and Secretary Donald Rumsfeld**
        601 "D" Street, N.W., Room 8130
19      Washington, DC 20004

20      **DAVID J. KARLIN, Deputy City Attorney**     **Attorneys for City of San Diego**
        1200 Third Avenue, Suite 1100
21      San Diego, California 92101

22   and that envelope was placed for collection and mailing on that date following ordinary business
     practices.
23

24      I certify and declare under penalty of perjury under the laws of the State of California that
     the foregoing is true and correct.

25      Executed on this **14th** day of **September, 2006**.

26

27                                                       Peter D. Lepiscopo, Esq.

28

## Listing of Presidentially Designated Monuments

| MONUMENT | PRESIDENT | Year | Proclaimed acres | Current Acres | SPECIAL DESIGNATIONS AND UNIQUE FEATURES |
|---|---|---|---|---|---|
| Papago Saguaro, AZ | Wilson (D), Harding (R) | 1914 | 2,050 | 0 | Abolished, 1930. |
| Cabrillo, CA | Wilson (D) | 1913 | 1 | 137.06 | Juan Rodriguez Cabrillo and party were the first Europeans to walk on the Pacific coast. Cabrillo also explored much of the coastline of California. |
| Walnut Canyon, AZ | Wilson (D) | 1915 | 960 | 2,011.62 | "prehistoric ruins of ancient cliff-dwellings" (Proc. No. 1318) |
| Dinosaur, UT & CO | Wilson (D), Coolidge (R) | 1915 | 80 | 210,844.02 | "Deposit of Dinosaurian and other gigantic reptilian remains" of the Jurassic period. (Proc. No. 1313) |
| Bandelier, NM | Wilson (D), Hoover (R), Eisenhower (R) | 1916 | 23,352 | 32,737.20 | "pueblo type archaeological ruins"(Proc. No. 3388). Wilderness (23,267 acres), 1976 |
| Old Kassan, AK | Wilson (D) | 1916 | 43 | 0 | Abolished, 1955. |
| Verendrye, ND | Wilson (D) | 1917 | 253 | 0 | Abolished, 1956. |
| Sieur de Monts, ME (Acadia National Park) | Wilson (D) | 1916 | 5,000 | 46,995.98 | "The topographic configuration, the geology, the fauna and the flora of the island....are of great scientific interest" (Proc.No. 1339). Established as Lafayette National Park, 1919. Changed to Acadia National Park, 1929. |
| Capulin Mt., NM | Wilson (D) | 1916 | 640 | 792.84 | "striking examples of recent extinct volcanoes" (Proc. No. 1340). Changed to Capulin Volcano National Monument, 1987. |
| Casa Grande Ruins, AZ | Wilson (D) | 1918 | 480 | 472.5 | The ruins and ancient buildings are where a tribe of Hohokam people lived between 300 BC and 1450 AD. |
| Katmai, AK (National Park and National Preserve) | Wilson (D), Hoover (R), F.D.Roosevelt (D), Johnson (D), Carter (D) | 1918 | 1,088,000 | 3,674,540.87 | The Mt. Katmai eruption of 1912 still offers science the chance to study "the cause and the catastrophe" of volcanic eruptions. Established as a National Park and Preserve, 1980. Wilderness (3,473,000), 1980. |
| Scotts Bluff, NE | Wilson (D), Hoover (R), F.D.Roosevelt (D) | 1919 | 2,053 | 3,003.03 | The highest point in the state of Nebraska, Scotts Bluff was used as a landmark by travelers going west on the Oregon Trail. |
| Yucca House, CO | Wilson (D) | 1919 | 10 | 9.6 | "relic of the prehistoric inhabitants of that part of the country" (Proc. No. 1549) |
| Aztec Ruins, NM | Harding (R) | 1923 | 319.49 | 319.73 | The most significant sites of the Chaco and Mesa Verde Anasazi are found at Aztec Ruins. Designated a World Heritage Site in 1987 |
| Hovenweep, UT, CO | Harding (R), Truman (D), Eisenhower (R) | 1923 | 286 | 784.93 | "four groups of ruins ....show the finest prehistoric masonry in the United States" (Proc.No. 1654) |

**Exhibit 2**

The Wilderness Society – Feb. 2001





# Exhibit 3



# Exhibit 4



**Exhibit 5**



# Exhibit 6



# Exhibit 7



# Exhibit 8



# Exhibit 9



# Exhibit 10



**Exhibit 11**



**Exhibit 12**



# Exhibit  13





# Exhibit 14



# Exhibit 15



# Exhibit 16



God Bless America



"...for the son of man came not to be served but to serve..."        Matt, 20:28

Given in his honor by his loving family.



"He who hears My words and believes in Him who sent Me has eternal life and shall not receive judgment."
John 5:24

# Exhibit 17



# Exhibit 18



# Exhibit 19

**EXECUTIVE OFFICE OF THE PRESIDENT**

**OFFICE OF MANAGEMENT AND BUDGET**

**WASHINGTON, D.C. 20503**

July 19, 2006
(House)

# STATEMENT OF ADMINISTRATION POLICY

### H.R. 5683 - Acquisition of Mt. Soledad Veterans Memorial
(Rep. Hunter (R) CA and two cosponsors)

The Administration strongly supports passage of H.R. 5683 to protect the Mount Soledad Veterans Memorial in San Diego. In the face of legal action threatening the continued existence of the current Memorial, the people of San Diego have clearly expressed their desire to keep the Mt. Soledad Veterans Memorial in its present form. Judicial activism should not stand in the way of the people, and the Administration commends Rep. Hunter for his efforts in introducing this bill. The bill would preserve the Mount Soledad Memorial by vesting title to the Memorial in the Federal government and providing that it be administered by the Secretary of Defense. The Administration supports the important goal of preserving the integrity of war memorials.

\* \* \* \* \*

# Exhibit 20



# Exhibit 21

# Exhibit B

Exhibit B

1

2

3

4

5

6

7

8

9

10                        UNITED STATES DISTRICT COURT

11                       EASTERN DISTRICT OF CALIFORNIA

12                               ----oo0oo----

13  THE REV. DR. MICHAEL A.
    NEWDOW, IN PRO PER,
14

15            Plaintiff,
                                      NO. CIV. S-05-2339 FCD PAN
16        v.

17  THE CONGRESS OF THE UNITED
    STATES OF AMERICA, et al.,
18

19            Defendants.

20  _____/

21                               ----oo0oo----

22            This matter is before the court on a motion to

23  intervene filed by applicant Pacific Justice Institute ("PJI" or

24  "applicant").  Plaintiff, the Rev. Dr. Michael A. Newdow,

25  ("plaintiff") does not oppose applicant's intervention.[1]  For the

26

27

28
    _____
            [1]     Defendants have not filed a response to applicant's
    motion to intervene.

1  reason's set forth below,[2] applicant's motion to intervene as a

2  defendant is GRANTED.

### BACKGROUND[3]

4      On November 18, 2005, plaintiff filed a complaint in this

5  court, seeking declaratory and injunctive relief regarding the

6  use of the phrase "In God We Trust" as the national motto that is

7  also printed on United States currency. (Compl., filed Nov. 18

8  2005). The complaint names as defendants the Congress of the

9  United States of America, Peter Lefevre as Law Revision Counsel,

10 the United States of America, John William Snow as Secretary of

11 the Treasury, Henrietta Holsman Fore as Director of the United

12 States Mint, and Thomas A. Ferguson as Director of the Bureau of

13 Engraving and Printing. (Id.) On November 29, 2005, applicant

14 PJI filed a motion to intervene as a defendant in the action.

15 (Applicant's Mot. to Intervene, filed Nov. 29, 2005 ("Mot. to

16 Intervene")).

17     PJI is a Sacramento-based non-profit legal organization

18 dedicated to the preservation of religious and civil liberties.

19 (Aff. of Brad. W. Dycus in Supp. of Application Mot. to Intervene

20 ("Dycus Aff."), filed Nov. 29, 2005, ¶ 2). PJI has represented

21 numerous individuals, houses of worship, and religious

22 organizations which have been treated unjustly due to their

23 religious preferences. (Id. ¶ 3). PJI's mission and function is

24 to represent the interests of people of faith. (Id. ¶ 11). PJI

---

26     [2]    Because oral argument will not be of material
   assistance, the court orders this matter submitted on the briefs.
27 See E.D. Cal. L.R. 78-230(h).

28     [3]    Facts relating to the instant motion are drawn from
   plaintiff's complaint and applicant's Motion to Intervene. These
   facts are provided for background purposes only.

1  seeks to intervene as a defendant in this matter because it
2  believes that plaintiff's lawsuit "would seriously undermine
3  Pacific Justice Institute's organizational mission to protect
4  religious liberty, including public expression of religious
5  heritage."  (Id. ¶ 17).

6      PJI brings this motion for intervention as of right or for
7  permissive intervention.  In the alternative, PJI requests that
8  it be granted amicus status in the pending litigation.

9                              **STANDARD**

10     Federal Rule of Civil Procedure 24[4] provides two grounds for
11 intervention in federal court: intervention as of right and
12 permissive intervention.

13     Rule 24(a) governs applications for intervention as of
14 right.[5]  In the absence of a statute conferring an unconditional
15 right to intervene, the applicant must demonstrate that: (1) the
16 application is timely; (2) the applicant has an interest in the
17 subject matter of the litigation; (3) absent intervention,
18 applicant's interest will be impaired; and (4) the existing
19 parties inadequately represent the applicant's interests.  League
20 of United Latin American Citizens v. Wilson, 131 F.3d 1297, 1302
21 (9th Cir. 1997).  The focus of the court's inquiry should be the

22

23 ─────────────────
      [4]    All further references to the Rules are to the Federal
24 Rules of Civil Procedure, unless otherwise noted.

25     [5]    Rule 24(a)(2) provides: "Upon timely application anyone
   shall be permitted to intervene in an action . . . when the
26 applicant claims an interest relating to the property or
   transaction which is the subject of the action and the applicant
27 is so situated that the disposition of the action may as a
   practical matter impair or impede the applicant's ability to
28 protect that interest, unless the applicant's interest is
   adequately represented by existing parties."

                                 3

1  effect on the applicant, not on other parties to the litigation.

2  See 6 William Moore's Federal Practice 3d Ed. § 24.03(1)(c)

3  (2003).  The rule is construed broadly in favor of the

4  applicants.  Idaho Farm Bureau Fed'n v. Babbitt, 58 F.3d 1392,

5  1397 (9th Cir. 1995).

6      Applicants also may seek permissive intervention under Rule

7  24(b), which provides:

8          "Upon timely application, anyone may be
           permitted to intervene in an action . . . when
9          an applicant's claim or defense and the main
           action have a question of law or fact in common.
10         . . In exercising it discretion, the court shall
           consider whether the intervention will unduly
11         delay or prejudice the adjudication of the
           rights of the original parties."
12

13  Unlike intervention as of right, permissive intervention focuses

14  on possible prejudice to the original parties to the litigation,

15  not the intervenor.  See Moore's Federal Practice 3d Ed. §

16  24.10(1)(2003).

17      In reviewing a motion to intervene, the court generally

18  should accept as true the allegations and evidence submitted by

19  the applicant.  Southwest Center for Biological Diversity v.

20  Berg, 268 F.3d 810, 819-820 (9th Cir. 2001).

21                        **ANALYSIS**

22  **I.    Intervention as of Right**

23      Plaintiff first asserts that it should be permitted to

24  intervene as of right under Federal Rule of Civil Procedure

25  24(a).

26      **A.    Timeliness**

27      Timeliness is "the threshold requirement" for intervention

28  as of right.  United States v. Oregon, 913 F.2d 576, 588 (9th

4

1  Cir. 1990).  If the court finds "that the motion to intervene was
2  not timely, [it] need not reach any of the remaining elements of
3  Rule 24."  Wilson, 131 F.3d at 1302 quoting United States v.
4  Washington, 86 F.3d 1499, 1503 (9th Cir. 1996).  In determining
5  whether a motion is timely, the court considers: (1) the stage of
6  the proceedings; (2) the prejudice to other parties; and (3) the
7  reason for and length of the delay.  United States ex rel.
8  McGough v. Covington Techs., 967 F.2d 1391, 1394 (9th Cir. '1992).
9  "[A]ny substantial delay weighs heavily against intervention."
10 Wilson, 131 F.3d at 1302. (citations omitted).

11       Here, the action was filed on November 18, 2005, and the
12 motion to intervene was filed on November 29, 2005.  This motion
13 was brought at the outset of litigation, prior to the filing of
14 any response by the named defendants and prior to the issuance of
15 a pretrial scheduling order.  See Sierra Club v. U.S. E.P.A., 995
16 F.2d 1478, 1481 (9th Cir. 1993) (upholding trial court's finding
17 that application was timely where filed before defendant had
18 filed its answer).  There is no evidence that intervention by
19 applicant will prejudice any existing party.  Accordingly, the
20 court finds that applicant's motion to intervene was timely
21 filed.

22       B.    Interest in the Subject Matter
23       In addition to filing a timely motion, applicant must show
24 that it has an interest in the subject matter of the litigation.
25 Sagebrush Rebellion, Inc. v. Watt, 713 F.2d 525, 527 (9th Cir.
26 1983).  "A public interest group is entitled as a matter of right
27 to intervene in an action challenging the legality of a measure
28 it has supported."  Idaho Farm Bureau Fed'n, 58 F.3d at 1397

5

1  (citations ommitted) (upholding intervention by conservation

2  group that had participated in the listing of endangered species

3  in a suit alleging substantive and procedural violations of the

4  Endangered Species Act); Sagebrush Rebellion, 713 F.2d at 527.

5      Applicant's mission is the preservation of religious

6  liberty, including public expressions of the nation's religious

7  history and heritage.  (Dacus Aff. ¶ 17; Mot. to Intervene at 4).

8  Applicant has represented individuals, houses of worship, and

9  religious organizations which have been treated unjustly due to

10  their religious preferences.  (Dacus Aff. ¶ 3).  Applicant also

11  assists governmental entities which are attacked for public

12  acknowledgments of America's religious heritage.  (Id. ¶ 5).

13  Applicant asserts that the interpretation of the Establishment

14  Clause and the constitutionality of the motto "In God We Trust"

15  in the present action will affect PJI's mission and activities.

16  Given the Ninth Circuit's holding that Rule 24 should be

17  construed broadly in favor of the applicant, applicant has an

18  interest in the subject matter of the litigation.  See Idaho Farm

19  Bureau Fed'n, 58 F.3d at 1397.

20      C.   Impairment of Applicant's Interest

21      Applicant next must demonstrate that, absent intervention,

22  its interests in the litigation will be impaired.  Id.  Applicant

23  argues that the ability of PJI to defend expressions of religious

24  heritage will be severely hindered if the court declares the

25  government's use of phrase "In God We Trust" unconstitutional.

26  It is PJI's position that the removal of the motto "from the

27  public square will have a serious, detrimental effect on

28

6

1  Americans' awareness and appreciation" of the nation's religious

2  heritage.  (Dacus Aff. ¶ 14).

3      The mission of PJI is to "defend [the] nation's religious

4  heritage against overly-restrictive interpretations of the

5  Establishment Clause." (Id. ¶ 7).  It is also PJI's mission and

6  function to represent the interests of people of faith.  (Id. ¶

7  11).  An adverse decision in this suit would impair PJI's ability

8  to defend and promote American religious history and heritage.

9  See Sagebrush Rebellion, 713 F.2d at 527 (finding that a

10  conservation group's interest would be impaired because an

11  adverse decision would impair its mission of preserving birds and

12  their habitats).

13      **D.   Adequacy of Representation**

14      Finally, the applicant must demonstrate that the party on

15  whose side it seeks to intervene is not capable or willing to

16  make the intervenor's arguments.  See Idaho Farm Bureau Fed'n, 58

17  F.3d at 1398.  "The burden of making this showing is minimal."

18  Pacific Gas & Elec. Co. v. Lynch, 216 F. Supp. 2d 1016, 1025

19  (N.D. Cal. 2002) (citing Sagebrush Rebellion, 713 F.2d at 528).

20  Applicant may satisfy this burden by demonstrating that the

21  representation of their interests *may be* inadequate.  Trbovich v.

22  United Mine Workers, 404 U.S. 528, 538 n.10 (1971).  The Ninth

23  Circuit

24        considers three factors in determining the adequacy of
      representation: (1) whether the interest of a present

25        party is such that it will undoubtedly make all of a
      proposed intervenor's arguments; (2) whether the

26        present party is capable and willing to make such
      arguments; and (3) whether a proposed intervenor would

27        offer any necessary elements to the proceeding that
      other parties would neglect.

28

7

1  Arakaki v. Cayetano, 324 F.3d 1078, 1086 (9th Cir. 2003) (citing

2  California v. Tahoe Reg'l Planning Agency, 792 F.2d 775, 778 (9th

3  Cir. 1986)).

4      The defendants in the current action are all government and

5  political actors or bodies.  As such, defendants have various

6  competing interests to consider in asserting arguments and

7  defenses in this claim.  PJI is a non-profit organization with

8  the goal of preserving the public expression of American ʹ

9  religious history and heritage.  (Mot. to Intervene at 7).  As

10  such, PJI's goals and interests differ from those of the

11  defendants.  Thus, the defendants cannot necessarily be counted

12  on to make the same arguments as PJI.

13      Accordingly, because the four factor analysis under Rule

14  24(a) has been satisfied, applicant is entitled to intervene as

15  of right.

16  **II.  Permissive Intervention**[6]

17      Applicant also seeks permissive intervention pursuant to

18  Rule 24(b).  In order to intervene permissively, applicant first

19  must identify a common question of law or fact with the original

20  matter.[7]  Fed. R. Civ. P. 24(b).  Here, applicant argues that its

21  interest in protecting the public expression of religious

22  heritage will be impaired by an adverse judgment in this matter.

23  Applicant also asserts that its activities include defending the

24

25      [6]   While the court has found that applicant is entitled to
26  intervene as of right pursuant to Rule 24(a), the court considers
   applicant's motion in the alternative to permissively intervene
27  pursuant to Rule 24(b).

28      [7]   Timeliness also is a prerequisite for permissive
   intervention.  The court has found applicant's motion timely.
   See Section I.A., above.

8

1 | nation's religious heritage "against overly-restrictive
2 | interpretations of the Establishment Clause."
3 |     PJI seeks to interpose defenses that share common factual
4 | and legal questions as those raised in the main action which
5 | alleges violations of the Establishment Clause through the use of
6 | the motto "In God We Trust."   (Mot. to Intervene at 9).
7 | Therefore, the court grants applicant's motion for permissive
8 | intervention.

<div align="center">CONCLUSION</div>

10 |     For the reasons stated above, applicant's motion to
11 | intervene as of right pursuant to Rule 24(a) is GRANTED.   In the
12 | alternative, applicant's motion for permissive intervention is
13 | GRANTED.

15 |     IT IS SO ORDERED.
16 | DATED: January 6, 2006.

/s/ Frank C. Damrell Jr.
FRANK C. DAMRELL, JR.
United States District Judge